J-S43031-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.J.O., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 987 MDA 2023 |

Appeal from the Decree Entered March 27, 2023
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9337

BEFORE: McLAUGHLIN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:          **FILED: FEBRUARY 26, 2024**

A.M.M. ("Mother") appeals from the March 27, 2023 decree in the Luzerne County Court of Common Pleas involuntarily terminating her parental rights to her ten-year-old natural son, L.J.O. ("Child").[1, 2]  We affirm.

The record reveals that Child was adjudicated dependent prior to November 20, 2020,[3] when he was removed from Mother and placed in the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Child was born in September of 2012.

[2] By separate decree docketed on March 27, 2023, the orphans' court involuntarily terminated the parental rights of Child's father, A.J.O. ("Father"), who did not file a notice of appeal.

[3] Child was adjudicated dependent due to Mother's and Father's illegal drug use and unstable housing.  **See** N.T., 1/30/23, at 29.

physical custody of Luzerne County Children and Youth Services ("CYS" or "the agency") due to Mother testing positive for methamphetamines and marijuana, as well as the agency's concern about her unstable housing. *See* N.T., 1/30/23, at 29-30. CYS placed Child with his maternal aunt and her husband until July 23, 2021, when the agency then placed him in the pre-adoptive home of his maternal cousin and her husband. *Id.* at 63, 82-83.

In furtherance of Child's permanency goal of reunification, Mother was required to participate in drug and alcohol treatment, provide random drug screens, and maintain safe and stable housing. *Id.* at 30-31. CYS assisted Mother in complying with her treatment goals by referring her twice to Wyoming Valley Alcohol and Drug Services ("WVAD"). *Id.* at 21. In total, WVAD evaluated Mother on five separate occasions between December of 2020, and January of 2023. *Id.* at 14. After each of these evaluations, WVAD made treatment recommendations. Prior to July of 2022, Mother was recommended to attend WVAD's intensive outpatient program, which included weekly individual and group treatment sessions. *Id.* at 14-16. However, Mother was unsuccessfully discharged each time from WVAD's outpatient program for violating the attendance policy. *Id.*

On July 18, 2022, WVAD recommended that Mother attend inpatient drug and alcohol treatment due to a positive drug screen performed by WVAD. *Id.* at 17, 20. As best we can discern, Mother's inpatient treatment would have occurred at a different facility. The record reveals that Mother first

sought inpatient treatment in August of 2022, where she stayed for four days. *Id.* at 40.

Mother appeared at WVAD again for an intake appointment on October 19, 2022, and WVAD recommended outpatient treatment. *Id.* at 17-18. However, on November 2, 2022, after Mother tested positive in two additional drug screens, WVAD discharged her "to a higher level of care" at an inpatient facility. *Id.* at 18, 20. In December of 2022, Mother spent approximately twenty-eight days at a different inpatient facility than where she was admitted in August of 2022. *Id.* at 40-41.

On December 30, 2022, Mother appeared for an evaluation at WVAD for the last time. *Id.* WVAD recommended outpatient treatment again, but canceled services on January 13, 2023, due to her lack of attendance. *Id.* at 19. In addition, sometime between December 30, 2022, and January 13, 2023, Mother again tested positive in two drug screens performed by WVAD. *Id.* at 20.

Regarding Mother's permanency requirement to cooperate with random drug screens with CYS, the agency required that she screen once weekly pursuant to the agency's "color call-in system."[4] *Id.* at 30, 43. Over the course of Child's dependency, Mother participated in a total of nine random

---

[4] According to CYS caseworker, Megan Donovan, Mother was required to participate in the "color call-in system" throughout the life of the case. N.T., 1/30/23, at 30. Mother's color was yellow, which was called once per week. *Id.* at 42.

drug screens. *Id.* Mother began complying with weekly screens in January of 2023, the same month as the subject proceedings. *Id.* at 43. Out of the nine random drug screens that she attended, Mother tested positive for cannabinoids on every occasion except one and for methamphetamine and amphetamine on February 3, 2022. *Id.* at 8-9, 43, 65.

With respect to Mother's permanency goal to maintain stable housing, she had maintained a home for an undefined time-period during Child's dependency. *Id.* at 59-60. However, Mother lost her housing on an unspecified date and never regained it prior to the subject proceeding. *Id.*

On June 20, 2022, CYS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b). The orphans' court held a hearing on the petition on January 30, 2023, at which time Child was ten years old and had been residing for approximately eighteen months with his pre-adoptive kinship parents who had already adopted six children.[5, 6] *Id.* at 80, 82, 91.

---

[5] As best we can discern, the six adopted children were still minors. The record does not specify if the children are also relatives.

[6] The orphans' court appointed Corbett Price Law, LLC, as Child's legal counsel and guardian *ad litem* ("GAL"). The certified record confirms that the Child's legal and best interests do not conflict. *See* N.T., 1/30/23, at 100; *see also* 23 Pa.C.S. § 2313(a); *In re K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020) (holding appellate courts should engage in "limited *sua sponte* review" concerning a child's statutory right to counsel in the termination context).

- 4 -

CYS presented testimony from its caseworker, Ms. Donovan; George Hockenbury, from Northern Tier Research, a company that analyzes drug screens; and Samantha Martin, a clinical treatment supervisor at WVAD. Mother testified on her own behalf.

The orphans' court involuntarily terminated Mother's parental rights pursuant to Section 2511(a)(8) and (b) by decree dated March 24, 2023, and docketed on March 27, 2023. Mother, through newly appointed counsel, filed an appeal *nunc pro tunc* on June 20, 2023,[7] along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother questions whether the orphans' court abused its discretion or committed an error of law by terminating her parental rights under Section 2511(a)(8) and (b).[8] **See** Mother's Brief at 1 (unpaginated). We review Mother's issues under an abuse of discretion standard, which our Supreme Court has described, as follows.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial

---

[7] Pursuant to the May 26, 2023 order of this Court, the orphans' court vacated the appointment of Mother's trial counsel and appointed new appellate counsel on June 1, 2023. Upon petition, the orphans' court granted Mother leave to appeal *nunc pro tunc*, and Mother timely complied.

[8] The GAL filed a brief advocating for this Court to affirm the decree.

court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act ("Act"), which requires a bifurcated analysis. *See* 23 Pa.C.S. § 2511. The orphans' court must initially determine whether the conduct of the parent warrants termination under Section 2511(a). Only if the court determines that the petitioner established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which involves a child's needs and welfare. *See T.S.M.*, 71 A.3d at 267.

To involuntarily terminate parental rights, the petitioner must prove grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Instantly, the orphans' court involuntarily terminated Mother's parental rights pursuant to Section 2511(a)(8) and (b), which provides as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

This Court has explained, "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003).  Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite reasonable good faith efforts the child welfare agency supplied over a realistic time period.  *Id.*  The "relevant inquiry in this regard is whether the conditions that led to removal have been remedied and thus whether reunification of

parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009). Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of the agency's services. *In Re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

This Court has recognized "that the application of [Section 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [18] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*Id.*

Finally, pursuant to Section 2511(a)(8), the court must consider whether termination of parental rights would best serve the needs and welfare of the child. *Id.* at 1275-1276. The "needs and welfare" analysis is relevant to both Sections 2511(a)(8) and (b). In *In re Adoption of C.L.G.*, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), this Court stated,

while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*Id.* at 1009 (citations omitted).

With respect to Section 2511(b), the court is required to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Regarding the "emotional needs and welfare" of the child, our precedent has interpreted it to include "intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted).

Our Supreme Court in *In re E.M.*, 620 A.2d 481 (Pa. 1993), first recognized that the "emotional needs and welfare" analysis under Section 2511(b) should include, in part, the child's bond with his or her parent. In doing so, the orphans' court must examine the effect on the child of severing such a bond, and this includes "a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). The High Court explained:

Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or

- 9 -

significant, irreparable harm. *See E.M.*, 620 A.2d at 484 ("a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences").

*K.T.*, 296 A.3d at 1109-1110 (some citations omitted).

As such, the *K.T.* Court distinguished "extreme emotional consequences" from an "adverse impact" to the child when parental rights are terminated. *Id.* at 1111. Specifically, the Court cautioned that the orphans' court "must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.* at 1114. The Court concluded, "to grant termination when a parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.*

Moreover, in reiterating that the parental bond is only one part of the analysis, *K.T.* held that the "Section 2511(b) inquiry must also include consideration . . . [of] certain evidence **if it is present in the record**." *Id.* at 1113, n.28 (emphasis in original). The specific evidence at issue in *K.T.* related to the child's need for permanency and the length of time she had spent in foster care; the pre-adoptive nature of her foster home and the child's bond with foster parents; and whether the foster home met the child's developmental, physical, and emotional needs. *Id.* at 1112. The Court emphasized, however, that these foregoing factors were not an exhaustive list for consideration under all Section 2511(b) analyses. *Id.* at 1113, n.28.

Rather, the **K.T.** Court found, as noted above, that the particular facts of each case determine the factors to be considered.

The Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **K.T.**, 296 A.3d at 1109. For instance, if relevant in a case, the orphans' court "can equally emphasize the safety needs of the child" in its analysis under Section 2511(b). **See In re M.M.**, 106 A.3d 114, 118 (Pa. Super. 2014).

Instantly, Mother's argument with respect to Section 2511(a)(8) addresses her drug and alcohol addiction and lack of housing, which were the conditions that led to the removal of Child. Mother contends that she "has taken steps to address the issues." Mother's Brief at 7. Specifically, Mother asserts that she attended "large portions of her treatment" sessions with WVAD despite never completing any course of recommended treatment. **Id.** at 4-6. In addition, Mother avers that she "has completed inpatient rehab and is now in a recovery house where she participates in victim's resource services, mental health and drug and alcohol" treatment. **Id.** at 6 (citations to record omitted). Mother also claims to have access to the services of a certified recovery specialist who "takes her to meetings and helps look for housing." **Id.**

The record demonstrates that Mother first sought inpatient treatment in August of 2022, where she stayed for four days. N.T., 1/30/23, at 40. Thereafter, in December of 2022, Mother spent approximately twenty-eight days at a different inpatient facility and had reported to Ms. Donovan that she successfully completed that program. *Id.* at 40-41. By the time of the evidentiary hearing on January 30, 2023, Mother was enrolled in a "three-to-six-month program" at an inpatient drug and alcohol recovery house. *Id.* at 41. Thus, Mother did receive inpatient drug and alcohol treatment.

However, Mother's arguments fail to appreciate that she first sought treatment at an inpatient facility **after** receiving notice of the agency's filing of the involuntary termination petition. Therefore, the orphans' court was not permitted to consider Mother's belated attempts to remedy the conditions that led to Child's removal. *See* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court **shall not** consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.") (emphasis added). Indeed, Ms. Donovan testified, "prior to me serving [the petition on] [M]other, she was not engaged in any services." N.T., 1/30/23, at 45. Ms. Donovan also stated that she served Mother with the filing of the petition in July of 2022. *Id.* at 45-46. Thus, during the requisite time-period, Mother had never successfully completed a drug and alcohol treatment program.

- 12 -

Even if the court was permitted to consider Mother's actions after she received notice of the filing of the termination petition, the evidence showed that she had not yet cured her drug and alcohol addiction. Specifically, Mother testified that she was then residing in a drug and alcohol recovery house, which had commenced on a date unspecified in the record, and she would remain in the recovery house for another "[t]hree to six months." *Id.* at 68. The record contains no evidence that Mother had achieved sobriety. *See id*. at 62-62 (Ms. Donovan testified on cross-examination that Mother has made "slight progress, but . . . she still has a lot more to do to get there."). In fact, Mother testified that she last used methamphetamine on December 1, 2022, which was approximately two months before the subject proceeding. *Id.* at 68, 73.

Likewise, Mother did not have her own home at the time of the hearing. Ms. Donovan testified that Mother "was staying with friends" prior to her residing in the drug and alcohol recovery house. *Id.* at 59. Mother testified that her certified recovery specialist is helping her search for housing. *Id.* at 69.

Based on the foregoing record evidence, we hold that the following conclusion by the orphans' court is reasonable pursuant to Section 2511(a)(8):

> Even when Mother testified, she indicated that she was in treatment for approximately three to six months and was requesting that her son remain in his current situation until she is able to obtain housing. The court notes that Child has been in

- 13 -

placement since November 20, 2020, and at the time of the hearing, he was in placement for almost three years. Even at the time of the hearing, Mother was not able to take care of her son and was requesting that Child remain in foster care. Although the court commends Mother for improving herself, Child needs permanency and Mother had sufficient time to remedy her issues.

Orphans' Court Opinion, 8/9/23, at 10 (cleaned up); *see also R.J.S.*, 901 A.2d at 513 ("[B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."). Inasmuch as Child had been removed from Mother's custody for nearly three years at the time of the subject proceeding, and the conditions which led to his removal continued to exist, we discern no abuse of discretion by the court with respect to the first and second elements of Section 2511(a)(8).

The third and final element requires that termination best serve the needs and welfare of the child. *See* 23 Pa.C.S. § 2511(a)(8). Here, the record also supports the court's conclusion in this regard. Specifically, Ms. Donovan reported that Child suffers from cerebral palsy, and his pre-adoptive kinship parents are meeting his medical needs. *Id.* at 83. Ms. Donovan testified that Child particularly has "issues with his feet [which he] is in the process of

getting checked out [by] a doctor." *Id.* With respect to Child's developmental needs, Ms. Donovan testified on direct examination, as follows.

> Q. I think everyone who's met [Child] would say he's a bright child?
>
> A. Yes.
>
> Q. Who's been meeting his developmental needs?
>
> A. [The kinship parents].
>
> Q. How so?
>
> A. They foster his eagerness to explore and learn. They provide him with educational activities, educational trips, reading, any activity that he shows one little interest in they go out and they get him whatever he needs. He expressed that he wanted to learn ventriloquism, so they went out and got him a dummy. Anything that can feed his imagination or his education [the kinship parents] provide for that.

*Id.* at 83-84.

With respect to who provides for Child's emotional needs, Ms. Donovan testified that it is also the kinship parents. *Id.* at 84. She explained, "They love [Child] as if he was their own. They show him affection. They listen to him. . . ." *Id.* Thus, we likewise discern no abuse of discretion by the court in concluding that the termination of Mother's parental rights will best serve Child's needs and welfare pursuant to Section 2511(a)(8).

With respect to Section 2511(b), Mother relies upon Ms. Donovan's testimony in arguing that the court abused its discretion in terminating her parental rights. Mother asserts as follows.

Ms. Donovan testified there is an undeniable bond between Mother and Child and that he loves her and she loves him. She further testified that Mother never missed any visits unless it was because Child was sick or had activities that interfered with the visits. Mother provided food and snacks during visits and provided birthday gifts, Easter gifts, etc., and that Mother was appropriate during those visits. If Mother's rights were terminated, Ms. Donovan believes that Child would grieve for a period of time but would be okay and thrive after that grieving period is over.

Mother's Brief at 7-8 (citations to record omitted) (cleaned up).

Ms. Donovan testified on direct examination regarding Mother's supervised visitation with Child, as follows.

Q. Do you know if Mother utilized all of her visitation?

A. Well, yes and no at the same time. So . . . Child was originally placed with . . . his aunt. Mother was engaged in her visitation at that home. And she was visiting on a daily basis. Once Child moved into another kinship home, the visits [took place] at the agency and then they were moved to Vision Quest. So she did attend her Vision Quest visits. . . .

However, Child requested that visitations stop. He said that he wasn't comfortable with his visits with Mother, it was making him too sad. He said that Mother was promising him things like dogs and coming home and things like that, and he just wasn't comfortable. So at a hearing in November of 2022, the visits were suspended per the court order. And so she hasn't had any visitation since. Their last visit was on 11/16/22.

*Id.* at 43-44 (cleaned up).

Ms. Donovan also testified that Child has not asked for visits to resume.

*Id.* at 47. She further explained that she regularly made visits to Child in the kinship home, and "he would report to me that . . . his visits with Mother were not going well. He always wanted us to be sure that we knew that he loved his mother. However, he was aware of his mother's situation and he

- 16 -

expressed frustration of why can't she get better?" *Id.* at 84. In addition, Ms. Donovan testified that Child "knew that these things [promised by Mother] weren't going to happen anytime soon. . . . [Child] approached me and asked if he could come testify at the court hearing and talk to the judge and say what he wanted to do. And that's what he did, and it was granted that he would stop the visits." *Id.* at 85 (cleaned up).

Finally, Ms. Donovan testified:

Q. How old is [Child]?

A. He's ten.

Q. Pretty bright for his age?

A. He's very smart.

Q. Have you discussed whether or not he wants to be adopted?

A. I did.

Q. What did he say?

A. That he has found his forever family. . . .

*Id.* Ms. Donovan concluded that Child loves Mother but "knows and feels what's best for him would not be to be with his mother." *Id.* at 88.

Ms. Donovan testified that she observes a "parent-child bond" between the kinship parents and Child. *Id.* at 86. She explained she visits the kinship home, "We'll sit around the dining room table and [Child] will be having a snack, and [the kinship mother] will be next to him. And he'll put his arm around her and say . . . thank you for my snack, Mom. He's always saying I

love you to [the kinship parents]." ***Id.*** As such, Ms. Donovan concluded that it is in the best interest of Child for Mother's parental rights to be terminated. ***Id.*** at 89. Ms. Donovan stated that, if Mother's parental rights are terminated, child "would feel and grieve for period of time. But he has so much love and support in his family and his other [kinship] siblings and family members that he would be okay, and he would thrive after that grieving period is over." ***Id.*** Indeed, there is no evidence in the certified record that Child's relationship with Mother is "necessary and beneficial" to his developmental, physical, and emotional needs and welfare. ***K.T.***, 296 A.3d at 1114. Thus, we discern no abuse of discretion by the court pursuant to Section 2511(b). Accordingly, we affirm the decree.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 02/26/2024

- 18 -